# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**DEREK M. WILLIAMS,**

                 **Plaintiff,**

v.                                                        **Case No. 21-CV-1334**

**WARDEN SCOTT ECKSTEIN,** *et al.*,

                 **Defendants.**

## DECISION AND ORDER ON DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

Derek M. Williams who is incarcerated and representing himself, brings this lawsuit under 42 U.S.C. § 1983. (ECF No. 1.) Williams was allowed to proceed on First Amendment claims against defendants Warden Scott Eckstein, John Kind, William Swiekatowski, and Chris Heil for allegedly suspending his visitor privileges in retaliation for his communications with elected officials and for interfering with Williams's right to freedom of association. The defendants move for summary judgment (ECF No. 35). For the reasons stated below, the court grants the defendants' motion for summary judgment and this case is dismissed.

# FACTS

*Parties*

At all times relevant, Williams was incarcerated at Green Bay Correctional Institution (GBCI). (ECF No. 37, ¶ 1.) Defendant Swiekatowski was a lieutenant at GBCI; Kind was the security director at GBCI; Eckstein was the warden; and Heil was a social worker. (*Id.*, ¶¶ 7, 10, 13, 28.)

*The September 3, 2016, Incident*

It is undisputed that on September 3, 2016, non-defendant Rikki Fields came to GBCI to visit Williams. (ECF No. 37, ¶ 1.) Upon arrival, Fields and her bag had to go through a security x-ray machine. (*Id.*, ¶ 2.) The machine detected a suspicious item in Fields's bag. (*Id.*) Fields was asked to remove the item, which was confiscated, and then she was asked to leave GBCI. (*Id.*) GBCI staff inspected the item and determined that it was a latex glove that contained a condom that contained a charger for Apple products. (*Id.*, ¶ 3.) The non-defendant staff members "strongly suspected that Fields planned to pass [the charger] off to Plaintiff during their visit." (*Id.*, ¶ 4.) Williams does not dispute that Fields had the item, but he denies that she was going to pass it off to him. (ECF No. 47, ¶ 4.) As a result of the discovery, Swiekatowski decided to place Williams in Temporary Lock Up (TLU) pending an investigation into the apparent smuggling attempt. (ECF No. 37, ¶ 7.) The defendants also assert that this smuggling attempt prompted a temporary lockdown at GBCI. (*Id.*, ¶ 9.) Williams states that the lockdown was imposed not

2

because of his smuggling attempt but because a week later GBCI staff found a shank behind an ice machine in a common area. (ECF No. 55, ¶ 55.)

*Subsequent Investigation and Disciplinary Proceedings*

The investigation into the alleged smuggling attempt "turned up dozens of contraband items in Plaintiff's cell." (ECF No. 37, ¶ 9.) The investigation also uncovered an iPod located in an area that Williams had special access to as a result of job as a tier tender. (*Id.*) Williams notes that most of the contraband items were canteen items and "a hobby project", and none of the uncovered items "warranted any serious disciplinary action." (ECF No. 47, ¶ 9.) However, he does not dispute that the investigation uncovered contraband items; instead he contends that the defendants are "amplifying" what they found but does not elaborate on what that means. (*Id.*)

Williams remained in TLU for 25 days while the investigation was pending. (ECF No. 55, ¶ 4.) On September 27, 2016, Swiekatowski issued an Adult Conduct Report "charging Plaintiff with possession of contraband and attempted possession of an electronic device." (ECF No. 37, ¶ 10.) According to the defendants, Williams chose not to contest the charges, admitted he was guilty of the charges, and accepted as punishment 180 days in disciplinary segregation. (*Id.*) The defendants note that Williams signed a Waiver of Contested Major Disciplinary Hearing and Time Limits wherein he checked a box that stated, "I ADMIT I AM GUILTY." (ECF No. 40-1 at 3.) As a result, defendant Heil recommended that Fields be removed

from Williams's visitor list, but the decision was made by Heil's supervisor, not Heil. (ECF No. 55, ¶ 7.)

Williams states he accepted the 180-day punishment with the understanding from non-defendant Captain Schultz that he would be out in 90 days. (ECF No. 55, ¶ 5.) He also states that Schultz told him if he did not waive his hearing, he'd be facing 360 days in disciplinary segregation. (*Id.*) Additionally, Williams asserts that Heil made the decision to remove Fields from the visitor list. (*Id.*, ¶ 7.)

*Alleged Protected Activity*

Once Williams entered his disciplinary segregation, he asked segregation staff about when he'd "transfer to the treatment center". (ECF No. 55, ¶ 8.) According to Williams, the "treatment center is where inmates in the RHU [Restricted Housing Unit] go to transition back into the general population." (*Id.*) Segregation staff told Williams that Kind "gave a directive that plaintiff was not allowed to transfer to the treatment center." (*Id.*, ¶ 9.) This led Williams to believe that he would not be let out of segregation at 90 days as indicated by Schultz, but instead would serve the full 180 days. (*Id.*, ¶ 11.) Williams states that at the time, GBCI had a policy wherein only prisoners who committed serious infractions such as battery or sexual assault would actually serve the full segregation term and non-violent offenders, such as Williams, would either serve half time or transfer to the treatment center. (*Id.*, ¶¶ 13-14.) Williams also asserts that other prisoners with similar or even more serious conduct reports than him were allowed only to serve half time or go to the treatment center. (*Id.*)  Defendants assert that Williams went

4

through the stages of segregation appropriately and according to policy and note that Williams does not dispute this. (ECF No. 37, ¶¶ 12-13; ECF No. 47, ¶¶ 12-13.)

When Williams realized he would be serving his full 180-day disposition, he began writing his family and other acquaintances about "the unfair treatment GBCI was imposing on him." (ECF No. 55, ¶ 12.) In early October 2016, several people including Jazzmine Johnson, Velonia Williams, and Rikki Fields and other prisoner's rights advocates made phone calls to GBCI to inquire after why Williams was serving the full 180-day disposition. (*Id.*, ¶¶ 16, 24.) GBCI staff did not substantively respond to them and at times told them to stop calling. (*Id.*, ¶¶ 18. 19.) When their efforts to connect with someone at GBCI failed, they began contacting personnel at the Department of Corrections in Madison, Wisconsin. (*Id.*, ¶ 21.) However, the DOC did not meaningfully respond to their concerns. (*Id.*, ¶ 22.) At that point (it is unclear from the record exactly when), they started contacting elected officials including Lena Taylor, Nikkiya Harris, and Gwendolyn Moore. (*Id.*, ¶¶ 23, 25.)

Also in October 2016, Williams alleges that another prisoner, Fradario Brim, who Williams was helping with legal work, had a conversation with Swiekatowski. (ECF No. 55, ¶ 26.) According to Brim's declaration, while on the way to "the chow hall" Swiekatowski told him to "talk to Williams about having his people calling here and Madison . . ., my boss doesn't like it." (*Id.*, ¶ 30.)

5

*Swiekatowski's Investigation and Suspension of Visitation Privileges*

Sometime during Williams's 180-day disposition Kind asked Swiekatowski to investigate Williams's history with smuggling and possessing contraband. (ECF No. 37, ¶ 14.) Kind states he requested the investigation to "ascertain the threat, if any, Plaintiff posed to recidivate after he finished serving his 180-day disposition." (*Id.*, ¶ 15.) According to Kind, "[a] pattern of continuing to smuggle and possess contraband dispute previous discipline could warrant measures beyond temporary disciplinary separation to ensure institutional security." (*Id.*, ¶ 16.) Swiekatowski's investigation uncovered a long history of Williams either possessing or smuggling contraband. (*Id.*, ¶ 17.) His report stated that in 1997, Williams was found with contraband cigarettes and tobacco; in 1999 he was found with a drug pipe; in 2003, he created a business with one of his regular visitors with the intent to sell contraband items to other inmates; also in 2003 he conspired to smuggle pornography and other contraband into the institution; in 2010 he received a conduct report for conspiring with a visitor to smuggle drugs; and then the September 2016 incident. (*Id.*) Swiekatowski also noted in his report that Williams often used visitors to introduce contraband into the institution. (*Id.*, ¶ 18.) As a result, Swiekatowski recommend "that Williams's visiting privileges be revoked as he continues to pose a threat to the Department of Corrections." (*Id.*)

Kind reviewed Swiekatowski's report and based off of Swiekatowski's findings recommended to Eckstein that Williams receive a one-year suspension of his visitation privileges. (ECF No. 37, ¶ 19.) Kind states that he thought such a

6

suspension was "necessary to ensure the safety and security of GBCI." (*Id.*) Eckstein accepted Kind's recommendation, and on December 5, 2016, Williams's visitation privileges were suspended. (*Id.*, ¶¶ 20, 22.) Eckstein states that he decided to accept the recommendation because it was "appropriate in light of Plaintiff's repeated attempts—some successful—to smuggle contraband into correctional facilities with help of visitors." (*Id.*, ¶ 20.) Eckstein "also thought it would discourage Plaintiff from future smuggling attempts." (*Id.*)

Williams asserts he learned of the visitation suspension when he met with Swiekatowski to discuss an unrelated matter. (ECF No. 55, ¶ 35.) During that conversation, Williams states Swiekatowski told him that "a visitation suspension was taking place by the direction of John Kind and himself since some officials continue to call GBCI." (*Id.*). The defendants dispute this conversation took place. (*Id.*) On December 8, 2016, Williams received a letter from Kind stating that "Effective December 5, 2016, your visitation privileges at Green Bay Correctional Institution are suspended for a period of one year." (ECF No. 55, ¶ 36.)

Williams also takes issue with several findings in Swiekatowski's report. He notes that several of the infractions occurred decades ago, in the late 1990s. (ECF No. 55, ¶ 43.) Additionally, many of the infractions did not result in contraband actually being smuggled in. (*Id.*) Regarding the 2010 conspiracy to smuggle in drugs, he highlights that Larry Jenkins, a DAI Assistant Administrator determined that he did not actually "complete" the action of smuggling in drugs. (*Id.*) Williams believes that Swiekatowski, who wrote the resultant 2010 conduct report,

7

embellished that conduct report to make it seem like Williams successfully smuggled drugs into the institution. (*Id.*, ¶ 61.) Swiekatowski then repeated that finding in the 2016 investigation to effectuate Williams's visitor suspension. (*Id.*) Williams further notes that other prisoners at GBCI, who either had similar or worse conduct report histories, never lost their visitation privileges. (*Id.*, ¶ 48.) He also notes that none of those prisoners had involved elected officials in their concerns about their disciplinary segregation. (*Id.*, ¶ 51.)

Williams further asserts that the defendants, at various times in January and February 2017 mentioned that the reason Williams's visitor privileges were suspended was because he was complaining to outside people like elected officials. In January 2017, Brim states that he had conversation with Swiekatowski where he asked, "Why is Derek Williams under the gun?" and Swiekatowski responded, "He doesn't keep his complaints in house." (ECF No. 46, ¶ 33.) Then, on February 13, 2017, Williams asserts that Kind told him that "Your continuing efforts to contact officials will dig you a deeper hole. We are fed up with you, so get ready for A.C. [Administrative Confinement]." (ECF No. 48, ¶ 54.)

*Modification of Williams's Visitor Suspension*

When Williams received 180 days in segregation, one of the elected officials Rikki Williams reached out to was Wisconsin State Representative Evan Goyke. (ECF No. 55, ¶ 71.) When Rikki Williams learned that Williams's visitor privileges were suspended, she again contacted Goyke, who agreed to personally meet with her. (*Id.*, ¶ 72.) During that meeting, Rikki Williams told Goyke that the 2010

8

conduct report, which was used in part of justify the suspension of Williams's visitor privileges, was wrong. (*Id.*, ¶ 73.) According to Rikki Williams, Goyke told her that when he subsequently met with Eckstein and the DOC Legislative Liaison on February 9, 2017, Goyke told Eckstein that the 2010 conduct report erroneously stated that Williams brought drugs into GBCI, but the evidence supporting that conduct report demonstrated that Williams did not bring drugs into GBCI. (*Id.*, ¶¶ 74-75.) After learning this, Eckstein agreed to lift the visitation suspension. (*Id.*, ¶ 76.)

Eckstein does not dispute that he agreed to modify Williams's visitation suspension after he "heard concerns from an elected official and one of Plaintiff's family members" (ECF No. 37, ¶ 23.) After those conversations, Eckstein states he reassessed Williams's suspension and decided to modify it allow Williams to have tele-visits from three visitors of his choosing. (*Id.*, ¶ 24.) Williams notes that prior to his suspension, because he was in the Restricted Housing Unit, he was only allowed tele-visits anyway. (ECF No. 55, ¶ 79.) Also, according to Williams, just before Eckstein agreed to modify his restriction, Eckstein and Kind had already decided to review whether Williams needed to remain in segregation on administrative confinement status after his 180-day disposition ended. (*Id.*, ¶ 84.) This would effectively keep Williams in segregation, where only tele-visits were allowed, for another year. (*Id.*, ¶¶ 84-87.)

Williams received a memo from Kind dated February 9, 2017, informing him that he would be allowed three tele-visitors of his choosing. (ECF No. 37, ¶ 26.) On

9

February 14, 2017, Williams replied to Kind thanking him for allowing visitors and providing the names of his three tele-visitors. (*Id.*, ¶ 27.) It is undisputed that at the direction of Kind, Heil processed the paperwork that removed all but those three visitors from Williams's visitation list. (*Id.*, ¶ 28; ECF No. 47, ¶ 28.) Williams also does not dispute that "Heil was not involved in the decision to offer Plaintiff 180 days of disciplinary separation, in the decision to suspend Plaintiff's visitation privileges, or in the decision to modify that suspension to allow Plaintiff three tele-visitors." (ECF No. 37, ¶ 20; ECF No. 47, ¶ 29.) Williams asserts that on February 21, 2017, Heil made the decision to remove everyone off of his visitor list except the three tele-visitors. (ECF No. 55, ¶ 94.) The defendants assert that Heil, to comply with the modified suspension order, completed several Offender Visitor Review forms wherein she recommended to her supervisor that all visitors on Williams's visitor list be removed except for the three tele-visitors. (*Id.*) However, it was Heil's supervisor, non-defendant Michelle Haese, who made the decision to remove all the visitors except for the three tele-visitors. (*Id.*) Williams also asserts that when Heil visited his cell to give him the forms, he asked her what the problem with his visitation list was, and she responded that, "the problem is the people you keep contacting to contact us about what we're doing." (*Id.*, ¶ 95.) Heil states, she does not recall whether this conversation took place, but even if it did, she still would have processed the paperwork the same way. (*Id.*)

Williams remained in segregation with his modified visitor suspension until he transferred out of GBCI on May 11, 2017. (ECF No. 37, ¶ 31.) Williams states

10

upon arriving at his new institution, the Wisconsin Secure Program Facility, his full and complete visitation rights were reinstated because WSPF staff determined Williams did not have a history of smuggling contraband. (ECF No. 55, ¶ 113.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a

11

genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Williams claims that the defendants unconstitutionally retaliated against him for having his friends and family contact elected officials by suspending his visitation privileges. He also claims that in suspending his visitation privileges, the defendants violated his First Amendment right to freedom of association.

*First Amendment Retaliation Claim*

To make out a prima facie case on summary judgment Williams must show that: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity; and (3) the First Amendment activity was at least a motivating factor in the decision to suspend his visitor privileges. *Thayer v. Chiczewski*, 705 F. 3d 237, 251 (7th Cir. 2012). The defendants concede that Williams engaged in protective activity and that the suspension of visitor privileges is a deprivation that would deter protected activity. As for whether the protective activity was at least a motivating factor, Williams submits a sworn declaration from prisoner Fradario Brim that includes evidence of at least two instances where Brim was told that Williams had his privileges

12

suspended because he was having people contact elected officials. This is sufficient for Williams to make his prima facie showing.

Once a plaintiff makes his prima facie showing, a "defendant can rebut, but only by showing that his conduct was not a necessary condition of the harm—the harm would have occurred anyway." *Mays v. Springborn*, 719 F.3d 613, 634 (7th Cir. 2013).If a defendant produces such evidence, then the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus. *Thayer*, 705 F.3d at 252. "At the summary judgment stage, this means a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie." *Zellner v. Herrick*, 639 F.3d 371, 379 (7th Cir. 2011).

The defendants explain that Williams's visitation privileges were suspended after an investigation into Williams's past issues with smuggling and possession contraband items. At Kind's direction, Swiekatowski conducted the investigation. It is undisputed that the investigation uncovered that Williams had several issues in the past with smuggling and possession of contraband. While Williams disputes the defendants' characterization of these instances in Swiekatowski's report, he presents no evidence that Swiekatowski's findings were intentionally fabricated or otherwise used for retaliatory purposes. At most, he demonstrates that Swiekatowski erroneously described the 2010 incident, but a defendant's mistaken belief that a prisoner has committed an infraction is insufficient to establish retaliatory motive. *Johnson v. Eckstein*, Case No. 18-cv-1696-bhl, 2020 WL 6323412

13

at * 9 (E.D. Wis. Oct. 28, 2020). Note also that once Swiekatowski's mistake was uncovered, Eckstein modified the suspension of privileges.

Based off the report, Kind then decided to recommend the suspension of visitor privileges. Kind asserts that he made the recommendation because he was concerned about Williams's potential to fall back into the habit of smuggling and possessing contraband, and that his visitors seemed to enable these activities. Eckstein accepted the recommendation because he agreed with Kind that it would deter Williams from future smuggling attempts. Heil then helped with the implementation of the visitor suspension.

In an attempt to demonstrate that the defendants were not motivated by security concerns, but instead were motivated by Williams's friends contacting elected officials, Williams offers evidence of five statements that occurred on five different occasions. First, Williams offers an October 2016 comment that Swiekatowski made. However, Swiekatowski made that comment several weeks before the decision to suspend visitation was made, and the passage of time between the comment and the action does not support an inference of retaliation. *See Johnson*, 2020 WL 6323412 at *8 (noting that the Seventh Circuit Court of Appeals has held that a significant passage of time does not permit a reasonable inference of retaliation); *Hall v. Ill. Bell Telephone Co.*, 598 Fed. A'ppx 446, 448 (7th Cir. 2015) (finding that the lag in time "was not enough to establish a causal connection" between the protected activity and the adverse action).

14

Next, Williams relies on Kind's February 2017 comment to get ready for administrative confinement. But, that does not demonstrate that Williams's communications with elected officials caused the suspension of visitation. It might demonstrate that it caused Kind's recommendation to extend Williams's time in administrative confinement. However, Williams's was not allowed to proceed on a retaliation claim for being placed in administrative confinement for another year, and at summary judgment, he is limited to the screening order. *See Werner v. Hamblin*, Case No. 12-C-0096, 2013 WL 788076 at *2 (E.D. Wis. March 1, 2013).

That leaves Swiekatowski's comment on the day the suspension went into place, Swiekatowski's comment to Brim in January 2017, and Heil's comment to Williams when she was processing the visitor suspension. Taking the facts in a light most favorable to Williams, these comments may suggest that that the defendants may have acted with an unconstitutional motive. However, Williams has to show that the unconstitutional motive was the but-for cause of his visitor suspension, and he has failed to do so. "It may be dishonorable to act with unconstitutional motive . . . but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Thayer*, 705 F.3d at 252. Williams has not been able to overcome the defendants' assertion that they implemented the visitation suspension because of his past issues and because he posed a security risk. It is undisputed that he had several issues with possession and smuggling of contraband. Also, the reason he was currently in segregation was because of a smuggling attempt. At most, he demonstrates that his efforts with

15

elected officials may have been *one reason* for his suspension but he did not demonstrate that it was *the reason* for his suspension. Summary judgment on the First Amendment retaliation claims is granted in the defendants' favor.

*First Amendment Freedom of Association Claim*

"Prisoners retain a limited constitutional right to intimate association." *Easterling v. Thurmer*, 880 F.3d 319, 322 (7th Cir. 2018).[1] Regarding family visits, the United States Supreme Court has held that limits on family visits may violate the Constitution if they are " 'permanent or for a [long] period' or if [they are] 'applied in an arbitrary manner'" *Id.* (quoting *Overton v. Bazzetta*, 539 U.S. 126, 137 (2003)). However institutions can limit familial visits if the limit is "reasonably related to legitimate penological interests." *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). To determine that the limit is reasonably related to a legitimate interest, the Supreme Court in *Turner* outlined four factors for district courts to consider:

> (1) whether there is a rational relationship between the regulation and the legitimate government interest advanced; (2) whether the inmates have alternative means of exercising the restricted right; (3) whether and the extent to which accommodation of the asserted right will impact prison staff, inmates' liberty, and the allocation of limited prison resources; and (4) whether the contested regulation is an 'exaggerated response' to prison concerns and if there is a 'ready alternative' that would accommodate inmates' rights.

---

[1] The defendants argue that because *Easterling* was decided after the events of this case, this claim should be dismissed on the basis of qualified immunity. However, because even under *Easterling*, summary judgment is still granted in the defendant's favor, the court need not reach the qualified immunity question.

*Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010) (quoting *Turner*, 482 U.S. at 89-91). The Seventh Circuit has additionally elaborated that the first factor "can act as a threshold factor", *id.*, and "[w]here . . .there is only minimal evidence suggesting that the prison's regulation is irrational, running through each factor at length is unnecessary. *Mays v. Springborn,* 575 F.3d 643, 648 (7th Cir. 2009).

As discussed above, the defendants demonstrated that they had a legitimate penological interest in suspending Williams's visiting privileges because it is undisputed that Williams had issues in the past with using visitors to attempt to smuggle and possess contraband. There is only minimal evidence on the record that the limit was irrational—mere suggestions that perhaps the limit was imposed because Williams had friends complain to elected officials. Also, Williams has the burden of demonstrating that the defendants did not have a legitimate penological interest, *see Overton*, 539 U.S. at 132, and, as discussed above, he did not meet that burden. Summary judgment is granted in favor of the defendants on the First Amendment freedom of association claim.

## CONCLUSION

Summary judgment is granted in the defendants' favor on both the First Amendment retaliation claims and the First Amendment freedom of association claims. Because there are no remaining claims, Williams's case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (ECF No. 35) is **GRANTED.**

17

**IT IS FURTHER ORDERDED** that the case is **DISMISSED** The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case

Dated at Milwaukee, Wisconsin this 13th day of March, 2023.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge